## MAURICE JANKORD v. STATE.*

186 N. W. (2d) 530.

April 23, 1971—No. 42722.

* Certiorari denied, —— U. S. ——, —— S. Ct. ——, —— L. ed. (2d) ——, November 9, 1971.

*John S. Connolly,* for appellant.

*Warren Spannaus,* Attorney General, *George M. Scott,* County Attorney, and *David G. Roston,* Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Nelson, Otis, Rogosheske, and Peterson, JJ.

PETERSON, JUSTICE.

Petitioner was tried by the court without a jury upon an indictment for second-degree murder and convicted of first-degree manslaughter in the shooting death of his wife, Barbara Jankord. He seeks, by postconviction petition, to set aside the conviction solely on the ground that certain incriminating statements made to police officers at the time of his arrest were constitutionally inadmissible under the doctrine of Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. (2d) 694. This appeal is from the order denying his petition.

Petitioner's guilt in the homicide was established beyond a reasonable doubt even without the challenged statements. On January 1, 1969, at approximately 2:23 a. m., a telephone call, automatically tape recorded, came into the Minneapolis police dispatcher's office; an unidentified male voice said, "I just shot my wife," and asked that the police come to 3852 Minnehaha Avenue (which is the address at which petitioner and decedent occupied a basement apartment). Detective Rollo L. Mudge, Jr., who heard the call to the police dispatcher, interrupted to ask the caller, "Is she dead?" The caller replied, "What the hell do you think? I shot her in the head," and then hung up. Coral Rose Jankord, petitioner's mother, testifying for the defense, stated that at approximately the same time petitioner had telephoned her and said, "I killed Barbara." Petitioner, testifying on his own behalf at trial, recalled, "I called my mother and I can just vaguely remember calling the police."

Raymond D. Thompson and his wife occupied the first-floor apartment above that of petitioner and decedent. At about 2 a. m. on the morning of the shooting, petitioner was angered be-

cause Thompson's automobile was blocking his entry to a garage shared by the two tenants. This resulted in a brief scuffle which ended when decedent took petitioner into their own apartment. Shortly thereafter Thompson heard a "pop sound" from the vicinity of petitioner's apartment.

Uniformed police officers, Richard C. Collins and Thomas A. Hanson, had been dispatched to the address given by the unidentified telephone caller. Upon entering petitioner's apartment, they saw the body of decedent with a gunshot wound and a large quantity of blood on the right side of her head. Petitioner was lying on a bed a short distance away and his hands, "wet with blood," covered his face. The police officers immediately proceeded to handcuff his hands and feet. And as they did so, petitioner blurted, "I didn't mean to do it." This spontaneous utterance was not in reply to any question. The police officers' testimony as to this statement is challenged on the ground that the police officers had not given petitioner a Miranda warning.

Detective Mudge arrived at petitioner's apartment between 2:30 and 2:45 a. m. and, together with another detective, took charge of the investigation. Mudge administered a Miranda warning to petitioner by reading from a card supplied by the Hennepin County attorney and then asked him if he had shot his wife. Petitioner replied: "Yes." Mudge testified that petitioner added that "he was going to shoot that bastard upstairs that blocked his garage." Petitioner's responses to the interrogation of Mudge are challenged on the ground that he was at that time too intoxicated to make an intelligent waiver of his constitutional right to silence and to counsel.

Petitioner was thereafter taken to police headquarters and from there to the Minneapolis General Hospital for a test of his blood alcohol. As he was leaving the apartment with the police officers, petitioner said: "I didn't mean to do it." This statement, the admissibility of which is not challenged, was elicited from Officer Collins by defense counsel and was corroborated by petitioner's mother, Mrs. Jankord.

Detective Russell J. Krueger, who was not present on the morning of the shooting, took petitioner to the mortuary 2 days later. Petitioner "cried continually" and repeatedly "blubbered" that "I'm sorry I killed her. I didn't mean to do it. I'm sorry I killed her." Krueger had given petitioner the Miranda warning and this testimony, together with like testimony of the other police officers, was, as the trial court stated, the basis for convicting petitioner of manslaughter rather than murder.

Examination of the petitioner's apartment by the police officer disclosed a Belgium Browning .25 caliber automatic handgun at a point between the body of decedent and the bed upon which petitioner lay. There was a shell in the chamber and four bullets in the clip. A slug of that caliber was removed during autopsy from the head of the decedent.

■ Petitioner's claim that his statements to Officers Collins and Hanson were constitutionally inadmissible has no merit. The trial court found, as it clearly could from the unrebutted testimony of the police officers, that the statements were spontaneous and not in response to interrogation. To contend that a Miranda warning must be given simultaneously with the act of handcuffing a suspect in a violent crime is an absurdity. As expressly stated in Miranda (384 U. S. 478, 86 S. Ct. 1630, 16 L. ed. [2d] 726) :

"* * * Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. * * * Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

■ Petitioner's claim that his statements to Detective Mudge were constitutionally inadmissible because he had not intelligently waived his Miranda-declared constitutional right ordinarily would raise a more substantial question. Waiver must be proved

and is not presumed. Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 82 L. ed. 1461. As stated in Miranda, "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U. S. 475, 86 S. Ct. 1628, 16 L. ed. (2d) 724.

There is no question that petitioner was intoxicated, and the trial court so found. The critical question is whether petitioner was intoxicated to the extent that he was not competent to make a voluntary and intelligent waiver of his constitutional rights.[1] The trial court found, upon conflicting testimony and circumstantial evidence, that petitioner was not *so* intoxicated as to render him incompetent to make such waiver. The scope of our review, as we have so often repeated, is limited to the question of whether there is sufficient evidence to sustain the finding of the trial court. We hold that the evidence was sufficient.

Viewed from a cold record, the evidence was arguably close. Petitioner's blood alcohol one hour after the shooting measured .17, and it may well have been even higher at the time of the interrogation by Detective Mudge. Petitioner, by his own testimony and that of two women friends, had been drinking extensively in the Music Bar, which is located at Cedar and Riverside Avenues in Minneapolis, but he had thereafter driven the 3 miles from there to his home without incident. Defense counsel elicited from Officer Collins both that petitioner dozed off periodically and that he was "hysterical." Collins testified, however, that petitioner did not stagger when he was later taken from the premises. Although slurred speech may be a manifestation of intoxication, Detective Mudge testified that petitioner's "enun-

---

[1] We so held by inference in State v. Kinn, 288 Minn. 31, 178 N. W. (2d) 888. See, also, People v. Schompert, 19 N. Y. (2d) 300, 279 N. Y. S. (2d) 515, 226 N. E. (2d) 305; People v. Dacy, 5 Cal. App. (3d) 216, 85 Cal. Rptr. 57; State v. Smith, 3 Ore. App. 606, 476 P. (2d) 802. Cf. State v. Robinson, 3 Ore. App. 200, 473 P. (2d) 152; Logner v. North Carolina (M. D. N. C.) 260 F. Supp. 970, affirmed, (4 Cir.) 392 F. (2d) 222, certiorari denied, 393 U. S. 857, 89 S. Ct. 110, 21 L. ed. (2d) 126.

ciation" was "good" and that "his tone of voice was clear, sharp." The trial court, which had the opportunity to observe the witnesses, credited Mudge's testimony as "clear and convincing" on the point.

Notwithstanding any residual doubt we might entertain as to the mental capacity of petitioner at the time of interrogation by Mudge, we have no doubt that, on this record, any error in the admission of incriminating responses was harmless beyond a reasonable doubt.

Affirmed.